**Case No. 25-5911**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

KIMBERLY BANKS AND CAROL CANTWELL
*Plaintiffs - Appellees,*

v.

R.C. BIGELOW, INC.
*Defendant - Appellant.*

---

On Appeal from Final Judgment of the United States District Court
For the Central District of California
Case No. 2:20-cv-06208-SVW-RAO
The Honorable Dean D. Pregerson (Ret.)
The Honorable Stephen V. Wilson

---

# APPELLANT R.C. BIGELOW, INC.'S OPENING BRIEF
**[REDACTED]**

---

Miles D. Scully (SBN: 135853)
mscully@grsm.com
Timothy K. Branson (SBN: 187242)
tbranson@grsm.com
Matthew G. Kleiner (SBN: 211842)
mkleiner@grsm.com
Patrick J. Mulkern (SBN: 307272)
pmulkern@grsm.com
Tara N. Swanson (SBN: 358493)
tswanson@grsm.com

GORDON REES SCULLY
MANSUKHANI, LLP
101 West Broadway, Suite 2000
San Diego, CA 92101
Telephone: (619) 230-7419
Facsimile: (619) 696-7124

*Attorneys for R.C. Bigelow, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure, Rule 26.1, Appellant R.C. Bigelow states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

Date: April 9, 2026 By: */s/ Matthew G. Kleiner*
Matthew G. Kleiner

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... 3

TABLE OF AUTHORITIES ..... 7

I. INTRODUCTION ..... 13

II. JURISDICTIONAL STATEMENT ..... 16

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW ..... 16

IV. STATEMENT OF THE CASE ..... 17

A. Factual Background. ..... 17

i. Bigelow is 100% owned by an American family, with 100% of its employees and all three of its manufacturing facilities located in the United States. ..... 17

ii. Bigelow primarily sells packaged tea bags, which are manufactured in the United States. ..... 18

iii. Bigelow adopted the Challenged Statement and launched the "TeaProudly" campaign. ..... 21

B. Procedural Background. ..... 22

i. Appellees filed a complaint contesting the use of the Challenged Statement. ..... 22

ii. Appellees filed a motion for class certification. ..... 23

iii. Appellees moved for summary judgment as to the issues of falsity and materiality. ..... 23

iv. The district court denied Bigelow's motion in limine to exclude the purported sales evidence relied upon by Appellee's expert and allowed Appellees to conduct additional discovery regarding the IRI spreadsheets. ..... 25

a. [redacted]

b. The district court ruled the IRI spreadsheets were admissible after supplemental discovery and briefing. ........ 28

v. Based on the court's "legal findings", the admitted IRI spreadsheets, and Weir's testimony, the jury returned a jury verdict for Appellees. ........ 29

vi. The district court denied Bigelow's motion for new trial. ........ 31

vii. Bigelow filed an appeal. ........ 31

V. SUMMARY OF THE ARGUMENT ........ 31

VI. STANDARD OF REVIEW – MIXED ........ 34

A. Rulings made on summary judgment are reviewed de novo ........ 34

B. Evidentiary rulings and orders denying a motion for new trial are reviewed for abuse of discretion. ........ 35

C. A jury verdict is reviewed for substantial evidence. ........ 36

VII. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS THERE IS A GENUINE DISPUTE OF MATERIAL FACT REGARDING WHETHER THE CHALLENGED STATEMENT IS FALSE AND MATERIAL. ........ 36

A. Appellees are not entitled to judgment as a matter of law as to literal falsity as there is a substantive difference between "made" and "manufactured". ........ 37

B. There is a genuine dispute of material fact as to whether the "Manufactured in the USA 100%" portion of the Challenged Statement is false because a reasonable

consumer could easily interpret that statement to mean the tea bags are manufactured in the United States.......... 43

C. The district court erred in finding Appellees have shown reliance as they did not establish exposure or materiality.......... 47

i. The district court erred in presuming class-wide exposure without conducting an analysis under the standard for summary judgment.......... 49

ii. The district court erred in finding materiality was established as a matter of law as there is no brightline rule entitling Appellees to a presumption of materiality and there is a genuine issue of material fact.......... 51

a. Appellees are not entitled to judgment as a matter of law as the case law, at most, suggests a rebuttable presumption, not an automatic determination.......... 52

b. The district court improperly held Bigelow to a higher evidentiary burden even though sufficient evidence was submitted to rebut the presumption of materiality and raise a genuine issue of material fact.......... 55

VIII. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING THE IRI SPREADSHEETS. .......... 58

A. The district court erred in admitting the unauthenticated IRI spreadsheets. .......... 60

B. The district court erred in admitting the IRI spreadsheets as they were inadmissible hearsay.......... 64

i. The IRI spreadsheets are not admissible under the Rule 803(6) business records exception because they were purchased for litigation.......... 65

ii. The spreadsheets are not admissible under the Rule 803(17) market records exception because the sales projections resulting from IRI's proprietary algorithm are not "objective facts" ............................... 67

C. The district court's admission of the IRI spreadsheets prejudiced Bigelow in a manner warranting reversal. ........ 69

IX. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING THE EXPERT TESTIMONY OF COLIN WEIR. ............................................................................................... 71

A. Appellees failed to carry their burden under Rule 702(b) to show Weir's testimony is based on sufficient facts or data. ......................................................................... 72

B. Weir's testimony would not be admissible under Rule 703 as the IRI spreadsheets' probative value does not outweigh its prejudicial effect. ............................................ 73

C. The admission of Weir's expert testimony prejudiced Bigelow in a manner that warrants reversal. ...................... 76

X. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING BIGELOW'S MOTION FOR NEW TRIAL AND THE JURY VERDICT SHOULD BE REVERSED BECAUSE IT IS NOT SUPPORTED ANY EVIDENCE. ................................ 77

XI. CONCLUSION ................................................................... 83

CERTIFICATE OF COMPLIANCE ..................................................... 84

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 35

*Bauman v. Centex Corp.*,
611 F.2d 1115 (5th Cir.1980) .......... 74

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946) .......... 78

*Blanton v. Mobil Oil Corp.*,
721 F.2d 1207 (9th Cir. 1983) .......... 34

*Buetow v. ALS Enters.*,
650 F.3d 1178 (8th Cir. 2011) .......... 32, 37

*Colgan v. Leatherman Tool Grp., Inc.*,
135 Cal.App.4th 663 (2006), *as modified on denial of reh'g*
(Jan. 31, 2006) .......... 39, 40

*Connecticut Nat. Bank v. Germain*,
503 U.S. 249 (1992) .......... 39

*Crowley v. Epicept Corp.*,
883 F.3d 739 (9th Cir. 2018) .......... 35

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......... 72

*DSPT Int'l, Inc. v. Nahum*,
624 F.3d 1213 (9th Cir. 2010) .......... 35, 78

*In re Dual–Deck Video Cassette Recorder Antitrust Litigation*,
No. CIV 87–987 PHX RCB, 1990 WL 126500 (D.Ariz. July 25, 1990) .......... 68

*Ebner v. Fresh Inc.*,
838 F.3d 958 (9th Cir. 2016) .......... 43

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) .......................................................... 72

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal.4th 951 (1997)................................................................ 51, 54

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ........................................................ 72

*Equilon Enterprises v. Consumer Cause, Inc.*,
29 Cal.4th 53 (2002)........................................................................ 39

*Fischer v. United States*,
603 U.S. 480 (2024).......................................................................... 40

*Gonzales v. CarMax Auto Superstores, LLC*,
840 F.3d 644 (9th Cir. 2016)............................................................. 35

*Haddad v. Lockheed California Corp.*,
720 F.2d 1454 (9th Cir. 1983)........................................................... 70

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ............................................. 50

*Hall v. Marriott Int'l, Inc.*,
344 F.R.D. 247 (S.D. Cal. 2023), *on reconsideration in part,* No. 19CV1715-JO-AHG, 2023 WL 9692466 (S.D. Cal. June 6, 2023) ........................................................... 48, 49

*Hauk v. JP Morgan Chase Bank USA*,
552 F.3d 1114 (9th Cir. 2009)..................................................... 34, 35

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) ........................................ 52, 53

*Honeywell Int'l Inc. v. ICM Controls Corp.*,
45 F.Supp.3d 969 (D. Minn. 2014)............................................... 32, 37

*Hyer v. City & Cnty. of Honolulu*,
118 F.4th 1044 (9th Cir. 2024) ........................................................ 72

*JIPC Mgmt., Inc. v. Incredible Pizza Co.*,
No. CV 08-04310 MMM PLAX, 2009 WL 8591607 (C.D. Cal. July 14, 2009) ........ 68, 69

*Krueger v. Wyeth, Inc.*,
396 F. Supp. 3d 931 (S.D. Cal. 2019) ........ 76

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
No. C 12-03762 SI, 2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ........ 37

*Kwikset Corp. v. Superior Court*,
51 Cal.4th 310 (2011) ........ 48, 52, 53, 54, 55

*Larson v. UHS of Rancho Springs, Inc.*,
230 Cal.App.4th 336 (2014), *as modified* (Oct. 2, 2014) ........ 38

*Mattel, Inc. v. Walking Mountain Prods.*,
353 F.3d 792 (9th Cir. 2003) ........ 61

*McDowell v. Calderon*,
130 F.3d 833 (9th Cir. 1997) ........ 47

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir.2007) ........ 78

*Moore v. Trader Joe's Co.*,
4 F.4th 874 (9th Cir. 2021) ........ 43, 44

*MSP Recovery Claims Series LLC v. Farmers Ins. Exch.*,
No. 22-55610, 2023 WL 6633838 (9th Cir. Oct. 12, 2023) ..... 65, 66, 67

*Murphy Tugboat Co. v. Crowley*,
658 F.2d 1256 (9th Cir.1981), *cert. denied*, 455 U.S. 1018 ........ 34, 78

*Obrey v. Johnson*,
400 F.3d 691 (9th Cir. 2005) ........ 69, 70, 76

*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*,
157 Cal.App.4th 835 (2007) ........ 48

*People v. Morales*,
25 Cal.4th 34 (2001) .......... 47

*Raynor Bros. v. Am. Cyanimid Co.*,
695 F.2d 382 (9th Cir. 1982) .......... 78, 79, 80

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) .......... 49

*Sonner v. Schwabe N. Am., Inc.*,
911 F.3d 989 (9th Cir. 2018) .......... 33, 35, 43, 56, 57

*Southland Sod Farms v. Stover Seed Co.*,
108 F.3d 1134 (9th Cir. 1997) .......... 37

*Stephens v. County of Tulare*,
38 Cal.4th 793 (2006) .......... 39

*In re Tobacco II Cases*,
46 Cal.4th 298 (2009) .......... 48

*Tradewind Transp. Co. v. Taylor*,
267 F.2d 185 (9th Cir. 1959) .......... 36, 82

*Turner v. Burlington N. Santa Fe R. Co.*,
338 F.3d 1058 (9th Cir. 2003) .......... 74

*U.S. v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) .......... 39

*U.S. v. Valencia-Lopez*,
971 F.3d 891 (9th Cir. 2020) .......... 71

*United States v. Fischer*,
64 F.4th 329 (D.C. Cir.) .......... 40

*Ventura Packers, Inc. v. F/V JEANINE KATHLEEN*,
305 F.3d 913 (9th Cir. 2002) .......... 35

*In re Worlds of Wonder Securities Litigation*,
35 F.3d 1407 (9th Cir.1994) .......... 57

*Zakaria v. Gerber*,
2016 WL 6662723 (N.D. Cal. Mar. 23, 2016) .................................... 51

*Zeiger v. WellPet LLC*,
526 F.Supp.3d 652 (N.D. Cal. 2021) ................................................ 48

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) .......................................................... 49

**Statutes**

28 U.S.C. § 1291 ........................................................................ 16

28 U.S.C. § 1332(a) .................................................................... 16

Cal. Bus. & Prof. Code § 17533.7 ..................22, 24, 37, 38, 39, 40, 41, 42

Cal. Bus. & Prof. Code § 17533.7(a) .................................................. 40

**Rules**

9th Cir. R. 36-3(b) ...................................................................... 66

Fed. R. App. P. 4(a)(1)(A) ............................................................... 16

Fed. R. App. P. 4(a)(4)(A)(v) ........................................................... 16

Fed. R. App. P. 32.1 ...................................................................... 66

Fed. R. Evid. 103 .......................................................................... 69

Fed. R. Evid. 103(a) ................................................................. 69, 76

Fed. R. Evid. 702 ............................................................... 33, 71, 73

Fed. R. Evid. 702(a)-(d) .................................................................. 72

Fed. R. Evid. 702(b) ................................................................. 33, 72

Fed. R. Evid. 703 ..................................................... 33, 71, 73, 74, 75

Fed. R. Evid. 801 .......................................................................... 64

Fed. R. Evid. 802 .......................................................................... 64

Fed. R. Evid. 803(6) .......... 65

Fed. R. Evid. 803(6)(A)-(E) .......... 65

Fed. R. Evid. 803(17) .......... 67, 68, 69

Fed. R. Evid. 901 .......... 60

**Other Authorities**

CACI 4700 .......... 47

Rest.2d Torts, § 538, com. e .......... 51

Rest.2d Torts, § 538(2)(a) .......... 51

Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial ¶ 11:1409 (The Rutter Group 2003) .......... 61

# I. INTRODUCTION

This appeal arises from a jury verdict that was the inevitable result of a series of prejudicial errors. The district court decided dispositive pre-trial liability findings that should been left to the jury; allowed Appellees Kimberly Banks and Carol Cantwell ("Appellees") to rectify fatal evidentiary flaws in their one expert's testimony on the eve of trial; and allowed Appellees' damages expert to testify despite his reliance on unauthenticated, hearsay sales evidence. These rulings substantially prejudiced Appellant R.C. Bigelow ("Bigelow") and prevented any chance it had at a fair trial. The jury then inexplicably reached a damages number which had no evidentiary support in the record. The district court refused to correct this problem and declined to grant Bigelow a new trial. It is now time for a full reset of this action.

At its core, this is, or should have been, a straightforward case. Appellees are California residents and longtime, loyal customers of Bigelow. They contend, despite having purchased and enjoyed Bigelow tea for years or decades prior, that Bigelow's new addition of the phrase "Manufactured in the USA 100% American Family Owned" (the

"Challenged Statement") to its packaging was false and deceptive because the tea, itself, was not grown in America.

Founded in 1945, in response to financial losses suffered by the family during the depression, Ruth Bigelow and her family started what would become America's leading specialty tea company through hard work and an unadulterated passion for their product. Believing in the quality of its product and proud of its status as an American company, Bigelow added the Challenged Statement to its packaging. The purpose was to ensure the consumer knew Bigelow was an American company that packaged their teas in America with American workers. Appellees now claim the Challenged Statement is false because the tea Bigelow uses in its product is grown outside the United States. This is a false narrative; one the trial court denied Bigelow the opportunity to fully dispute on multiple fronts.

First, the district court cut Bigelow off at the knees in finding the Challenged Statement literally false and material as a matter of law at summary judgment. Bigelow presented sufficient evidence to create a genuine dispute of material fact that the Challenged Statement was

neither false nor material and thus both of these factual questions should have been decided by the jury.

Second, after Appellees attempted to prove their damages through the use of unauthenticated and hearsay spreadsheets of sales information from a third party, formerly known as Information Resources, Inc. ("IRI"), the district court provided Appellees the highly unusual and prejudicial opportunity to save the inadmissible IRI spreadsheets by allowing supplemental discovery on the literal eve of trial after four years of litigation. Six months later, Bigelow's evidentiary objections had not been cured, however, the district court allowed Appellees to rely on the spreadsheets anyway.

Third, the district court then allowed Appellees' expert Colin Weir ("Weir") to present his damages model grounded in these IRI spreadsheets to the jury, which was Appellees' only evidence for damages. Appellees, through Weir, presented a single price premium theory of 11.07% and there is no evidence in the record to support an award of anything other than 11.07% or 0.00%. Somehow, the jury did its own calculation and decided 8.0% was the appropriate measure for

damages. The district court ignored the guesswork and speculation engaged in by the jury and denied Bigelow's motion for new trial.

In all, the district court erred in: (1) granting Appellees' motion for summary judgment as to falsity and materiality; (2) admitting the IRI spreadsheets procured by Appellees for the litigation; (3) admitting the expert testimony of Weir as to the alleged price premium; and (4) denying Bigelow's motion for new trial on the grounds of unsupported damages.

Bigelow respectfully requests this Court vacate the judgment and remand for a new trial.

## II. JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this matter based on diversity under 28 U.S.C. § 1332(a). This Court has jurisdiction as Bigelow timely appealed the District Court's final judgment entered. (ECF 276 and 287; 28 U.S.C. § 1291; Fed. R. App. P. 4(a)(1)(A) and 4(a)(4)(A)(v).)

## III. STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether, at summary judgment, the district court correctly found the statement "MANUFACTURED IN THE USA 100%" was literally false as a matter of law.

2. Whether, at summary judgment, the district court correctly found the statement "MANUFACTURED IN THE USA 100% AMERICAN FAMILY OWNED" was material to consumers as a matter of law.
3. Whether, just one business day before trial, the district court erred in admitting the IRI spreadsheets produced by Appellees for the underlying litigation.
4. Whether the district court erred in allowing expert testimony and damages model from Weir based the inadmissible IRI spreadsheets.
5. Whether the district court erred in denying Bigelow's motion for new trial on the basis that no evidence exists in the record to support the jury award.

## IV. STATEMENT OF THE CASE

### A. Factual Background.

#### i. Bigelow is 100% owned by an American family, with 100% of its employees and all three of its manufacturing facilities located in the United States.

Bigelow was founded by Ruth C. Bigelow out of her New York City kitchen in 1945. (6-ER-998.) Ruth was an interior designer who, along with her husband, lost everything in the depression. (6-ER-1001.) This

tragedy inspired Ruth, who "wanted to create a business for her family." (6-ER-1002.) Ruth had "heard of a colonial recipe" for tea and "went into her kitchen" and "created what she thought it would be like." (*Id.*) Ruth then sent her tea "to a group of ladies…in the city" who said it was a "source of 'Constant Comment.'" (*Id.*) This began Bigelow's journey to reinvent tea in America. (*Id.*)

Ruth and the Bigelow family began selling tea out of their car and in local shops. (6-ER-1004.) Demand grew and they started a small factory in Norwalk, Connecticut, eventually moving their headquarters to Fairfield, Connecticut in 1990. (6-ER-1006-1007.) Today, Bigelow proudly operates three manufacturing facilities in the United States–Fairfield, Connecticut; Louisville, Kentucky; and Boise, Idaho (collectively the "US Manufacturing Facilities"). (10-ER-1680.) Bigelow produces billions of tea bags annually, cementing it as the leading specialty tea company in the United States. (*Id.*)

**ii. Bigelow primarily sells packaged tea bags, which are manufactured in the United States.**

Bigelow's bread and butter is packaged tea bags, amounting to 122 of its 123 products. (10-ER-1680.) [redacted] and all nine of the products certified

in the class are packaged tea bag products. (*Id.*) To manufacture the tea bags, Bigelow must source organic and non-organic components. (10-ER-1681.) [redacted] (*Id.*) Bigelow sources most of its tea from China, India, and Sri Lanka. (10-ER-1682.) The harvested leaves must be processed by third-party suppliers before they are suitable for use. (*Id.*) This processing requires withering, rolling, oxidizing, drying, and sorting the raw tea leaves, which establishes the characteristics of the leaves purchased and imported by Bigelow. (*Id*; 5-ER-677-678.)

[redacted] (10-ER-1682.) Bigelow creates all its own blends at its manufacturing facility in Fairfield, Connecticut—with raw leaves arriving in 25-to-50-kilogram bags. (5-ER-707.) Other raw organics, such as flavorings and herbals, are also shipped to and stored at the Fairfield facility. (5-ER-708.)

In the Fairfield facility, blending is done in 1,000-pound batches according to formulations, which are followed strictly to give the resulting tea bags the right "end-flavor profile." (*Id.*) This process is overseen by the blending department, which samples the product

multiple times throughout. (5-ER-708.) The blended batch is then placed into 50-pound bags and shipped to one of Bigelow's other US Manufacturing Facilities or kept at the Fairfield facility. (*Id.*) This manufacturing process is documented extensively by Bigelow due to its status as a food manufacturing company. (5-ER-709.) This documentation helps Bigelow produce "a product of high quality, [and a] safe product [ ] that is consistent over time." (*Id.*; *see also* 9-ER-1656.)

Once the tea blends are complete, they are then packaged at one of the US Manufacturing Facilities. (5-ER-716.) This process is overseen by the packaging department and documented. (*Id.*; *see also* 9-ER-1601; 9-ER-1632; 9-ER-1656.) [redacted] (10-ER-1683.) To create the as-purchased tea bag, [redacted] (*Id.*) The packaged tea products are then boxed into rectangular cartons, which have various designs and

marketing slogans. (10-ER-1681.) Each box of Bigelow tea tells the consumer at which of the US Manufacturing Facilities it was packaged and the specific employee in the United States who packaged it. (6-ER-1018-1019.)

#### iii. Bigelow adopted the Challenged Statement and launched the "TeaProudly" campaign.

In 2017, Bigelow launched its TeaProudly campaign. (5-ER-747.) The purpose of this campaign was to inform consumers that Bigelow tea bags were manufactured in the United States by a family-owned, American company. (6-ER-873; 6-ER-915.)

At the same time, Bigelow began to use the Challenged Statement — "Manufactured in the USA 100% American Family Owned" —on the back of the box in the bottom right corner. (5-ER-722.) The Challenged Statement was designed to address Bigelow's concern that its consumers did not know Bigelow was an American company. (5-ER-721-722.) Bigelow has "always been an American company" and "wanted to look for some way to convey that to both [their] customers" and their "retail chain stores." (5-ER-721.) Further, Bigelow wanted its consumers to know they were not "part of a big conglomerate" who was "owned by somebody else"

like many of their competitors, but was instead "family-owned and located in America." (5-ER-721-722.)

### B. Procedural Background.

#### i. Appellees filed a complaint contesting the use of the Challenged Statement.

Appellees are long-time Bigelow tea consumers who alleged they were misled by the Challenged Statement. (ECF 11.) Appellees alleged they had purchased Bigelow tea in 2019 and 2020 containing the Challenged Statement on the box. (*Id.*) Appellees further alleged Bigelow had "intentionally propagated", via the Challenged Statement, "the misconception" that "the Products are manufactured in the USA… [h]owever, none of the products contain any tea that was grown or processed in the United States." (*Id.*)

On July 12, 2020, Appellees filed a class-action lawsuit against Bigelow. (ECF 01.) The operative First Amended Complaint ("FAC") alleged causes of action for/under: (1) California Business & Professions Code section 17533.7 ("Section 17533.7"); (2) California Consumer Legal Remedies Act; (3) California False Advertising Law; (4) Unfair Competition Law; (5) Breach of Express Warranty; (6) Breach of Implied Warranty; (7) Intentional Misrepresentation; (8) Negligent

Misrepresentation; and (9) Unjust Enrichment and Common Law Restitution. (ECF 11.) The equitable claims under Unfair Competition Law, False Advertising Law, and unjust enrichment and request for equitable relief were later dismissed. (ECF 22.)

**ii. Appellees filed a motion for class certification.**

Appellees moved to certify the class. (ECF 39.) The district court granted Appellees' motion for class certification and certified a class of customers "who purchased at least one 18/20 count box of" Bigelow Tea labeled as 'Manufactured in the USA 100% American Family Owned. . . .'" (ECF 83.)

**iii. Appellees moved for summary judgment as to the issues of falsity and materiality.**

After engaging in discovery, both Bigelow and Appellees filed motions for summary judgment. The district court granted Appellees' motion for partial summary judgment finding: (1) the statement "Manufactured in the USA 100%" was literally false as a matter of law; and (2) the statement "Manufactured in the USA 100% American Family

Owned" was material to consumers as a matter of law. (1-ER-22; 1-ER-26.) [1]

In finding the "Manufactured in the USA 100%" portion of the Challenged Statement literally false, the district court determined there was no substantive difference between the words "made" and "manufacture", citing Section 17533.7, despite this claim having been dismissed by Appellees pursuant to a stipulation. (1-ER-19.) The district court also found Appellees were entitled to judgment as a matter of law as to materiality because "when the legislature has seen fit to specifically outlaw certain statements in order to protect consumers, such statements are material as a matter of law." (1-ER-25.)

The district court denied Bigelow's summary judgment motion. (1-ER-29.)

[1] Appellees did not raise any argument pertaining to the falsity of the "100% American Family Owned" portion of the Challenged Statement. (3-ER-330.)

#### iv. The district court denied Bigelow's motion in limine to exclude the purported sales evidence relied upon by Appellee's expert and allowed Appellees to conduct additional discovery regarding the IRI spreadsheets.

Bigelow filed a motion in limine to exclude Appellees' purported third-party sales evidence within spreadsheets created by IRI.[2] (ECF 151.) Appellees' expert Weir relied heavily on the IRI spreadsheets, which purport to show Bigelow sales throughout California. At the pretrial conference, one business day before trial, the district court expressed serious concerns about the admissibility of the IRI spreadsheets. The district court questioned "why we're going to go down the path, just generally in the law where we're going to allow a third-party source to provide sales data as opposed to attempting to get it directly from, you know, the primary source." (2-ER-109.) The district court also expressed "concern[] about the plaintiff's ability to satisfy the

[2] IRI was a market research company that merged with NPD Group to form Circana. (Circana, *IRI and NPD Complete Merger, Creating a Leading Global Technology, Analytics and Data Provider* (Jul. 21, 2022) https://www.circana.com/post/news-press-releases-iri-and-npd-complete-merger.) The data used by Weir was obtained from IRI and the underlying motions reference the data under the IRI umbrella. Bigelow, therefore, uses IRI in reference to IRI/Circana for the sake of clarity.

admissibility of the underlying data that was produced for purposes of litigation, not a general marketplace type of report that is typically relied on and can be relied on by experts" and the unknown algorithms used by IRI, referring to them as a "black box issue." (2-ER-99-100.) Despite these concerns, the district court did not grant Bigelow's motion in limine, but instead continued the trial to allow Appellees the opportunity to conduct limited discovery as to the admissibility of the sales evidence. (2-ER-100; 2-ER-164-165.) Appellees then deposed Circana Executive Vice President Robert Porod ("Porod"), who testified about IRI and the spreadsheets. (11-ER-1933.)

**a.** [redacted]

[redacted]

[redacted]

[redacted] Weir posited that "85 to 90 percent" of the data was through registered sales and "10 to 15 percent" was an estimate. (7-ER-1250.) However, IRI did not testify to this number, nor is there any document in the record to confirm this. (*Id.*)

**b. The district court ruled the IRI spreadsheets were admissible after supplemental discovery and briefing.**

Following Porod's deposition, the parties filed supplemental briefing on Bigelow's motion in limine to exclude the IRI spreadsheets. (ECF 208; 214.) The day before the new trial date, the district court denied Bigelow's motion in limine and ruled Appellees could present Weir's testimony and damages model, and objections to individual aspects would be ruled on as they arose in trial. (1-ER-11-12.)

#### v. Based on the court's "legal findings", the admitted IRI spreadsheets, and Weir's testimony, the jury returned a jury verdict for Appellees.

A six-day jury trial was held. Since the district court already decided the Challenged Statement was false and material, the only remaining issue was damages. Appellees, through Weir's testimony, argued an 11.07% price premium, amounting to $3,266,679.00 in damages and punitive damages. (7-ER-1183.)

In support of the price premium, Weir testified as to how he reached 11.07%. Weir explained that he conducted a survey in which participants were shown "examples of tea packages and they [had] to choose which of the tea packages that they're presented with that they would prefer to purchase." (7-ER-1134.) The participants were then instructed to "give an indication of whether they would or would not purchase those teas in real life." (*Id.*) Following this, the "data [was] [] processed through a regression model that provides data that can be input into a market simulation." (7-ER-1135.) Weir would then run the market simulation, which in turn "returns the given details of the survey, the price premium or overpayment amount", ultimately resulting in his alleged price premium of 11.07%. (*Id.*) Weir used the IRI spreadsheets to determine

the number of products sold and the total sales for the class to determine the actual damages. (7-ER-1155.) The only price premium Weir presented to the jury to consider was 11.07%. (7-ER-1131; 7-ER-1135; 7-ER-1149; 7-ER-1151; 7-ER-1170; 7-ER-1176; 7-ER-1208.)

In response, Bigelow presented two experts to rebut Weir's testimony, Sarah Butler ("Butler") and Dr. Bruce Strombom ("Dr. Strombom"). Both testified that Weir's study, and ultimate conclusion of an 11.07% price premium, were fatally flawed. Butler opined the damages model was improper as: (1) Weir incorrectly designed his study; (2) Weir's study was afflicted by focalism bias; and (3) Weir's study was subjected to demand effects. (8-ER-1361-1362.) Dr. Strombom opined the study: (1) ignored real-world pricing; (2) measured change and willingness to pay instead of a price premium; and (3) inappropriately assumed there is a single price premium that applies to every transaction during the class period for the challenged products. (8-ER-1409.) Importantly, neither expert provided testimony of an alternative price premium or evidence which would enable the jury to modify the price premium to account for the study's flaws.

The jury returned a verdict in favor of Appellees on all claims, awarding $2,360,744.00 in damages, rejecting Weir's 11.07% price premium and adopting its own price premium of 8%. (ECF 276.) The jury did not find Bigelow liable for punitive damages. (*Id.*)

#### vi. The district court denied Bigelow's motion for new trial.

Bigelow timely filed a motion for new trial or, in the alternative, remittitur for unsupported damages based on jury speculation. (2-ER-33.) Specifically, Bigelow argued there was no evidence upon which the jury could have based its $2.3 million award. (2-ER-45.) Neither 8%, nor the $2.3 million amount were raised during the trial, thus Bigelow argued the award could only have been based on speculation and conjecture. (2-ER-37.) The district court denied Bigelow's motion for new trial. (1-ER-7.)

#### vii. Bigelow filed an appeal.

Bigelow timely filed a notice of appeal. (3-ER-352.)

## V. SUMMARY OF THE ARGUMENT

The district court erred at four points in the underlying litigation: (1) finding the "Manufactured in the USA 100%" portion of the Challenged Statement literally false and material as a matter of law at

summary judgment; (2) admitting the IRI spreadsheets; (3) admitting Weir's expert testimony; and (4) denying Bigelow's motion for new trial on the grounds of unsupported damages.

First, the district court erred in finding the "Manufactured in the USA 100%" portion of the Challenged Statement literally false and material as a matter of law at summary judgment. Specifically, the district court erred in finding this portion of the Challenged Statement literally false as "'only an unambiguous message can be literally false.'" (*Honeywell Int'l Inc. v. ICM Controls Corp.*, 45 F.Supp.3d 969, 986 (D. Minn. 2014), quoting *Buetow v. ALS Enters.*, 650 F.3d 1178, 1186 (8th Cir. 2011).) The phrase "Manufactured in the USA 100%" is an ambiguous message that can be interpreted differently by a reasonable consumer. Thus, Appellees were not entitled to a finding of literal falsity as a matter of law.

Further, the district court found Appellees were entitled to judgment as a matter of law as to materiality relying on the claimed fact that the legislature outlawed this portion of the Challenged Statement and, therefore, it must be material as a matter of law. (1-ER-25.) However, neither case cited by the district court establishes a brightline

rule that a party is automatically entitled to a finding of materiality as a matter of law like the district court concluded. Instead, these cases suggest the statute only creates a rebuttable presumption of materiality that can be overcome with sufficient evidence presented by the non-moving party. Bigelow presented sufficient evidence to overcome this presumption and created a genuine dispute of material fact. The district court's rejection of Bigelow's evidence as "self-serving surveys and market research" held Bigelow to a standard beyond that required at summary judgment—something this Court explicitly rejected in *Sonner v. Schwabe N. Am., Inc.* ("*Sonner*"), 911 F.3d 989 (9th Cir. 2018).

Second, the district court abused its discretion in admitting the IRI spreadsheets and Weir's expert testimony. As a threshold matter, the IRI spreadsheets are unauthenticated and inadmissible hearsay. Further, Appellees failed to satisfy their burden under Federal Rules of Evidence, Rules 702 and 703 to show Weir's testimony was admissible. Specifically, Appellees failed to show Weir's testimony was "based on sufficient facts or data" or that "their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." (Fed. R. Evid. 702, subd., (b); Fed. R. Evid. 703.)

Finally, the district court erred in denying Bigelow's motion for new trial on the grounds of unsupported damages. "A damage award [] cannot stand if it 'could only have been based on speculation or guesswork.'" (*Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1216 (9th Cir. 1983), quoting *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1263 (9th Cir.1981).) The price premium theory presented by Appellees was one the jury had to accept in an "all or nothing" fashion. The damages model and price premium were based on Weir's conjoint survey, which the jury cannot rerun to account for testimony from Bigelow's experts about its deficiencies. Thus, the jury award of an amount different from Appellees' price premium constitutes speculation and guesswork.

## VI. STANDARD OF REVIEW – MIXED

This appeal requires the application of different standards of review.

### A. Rulings made on summary judgment are reviewed de novo.

The district court's grant of Appellees' partial motion for summary judgment is reviewed de novo. (*Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1117 (9th Cir. 2009). The Court "'must determine, viewing the evidence in the light most favorable to the non-moving party, whether

there are any genuine issues of material fact and whether the district court correctly applied the relevant law.'" (*Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 648 (9th Cir. 2016), quoting *Ventura Packers, Inc. v. F/V JEANINE KATHLEEN*, 305 F.3d 913, 916 (9th Cir. 2002).) The Court "may not weigh the evidence or make credibility determinations." (*Hauk* at 1117.) "'[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case.'" (*Sonner, supra,* at 992, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).)

### B. Evidentiary rulings and orders denying a motion for new trial are reviewed for abuse of discretion.

The district court's rulings on the admissibility of the IRI spreadsheets and Weir's testimony are reviewed for abuse of discretion and the appellant must show prejudice to warrant reversal. (*See Crowley v. Epicept Corp.*, 883 F.3d 739, 752 (9th Cir. 2018).) Similarly, the district court's denial of Bigelow's motion for new trial is reviewed for abuse of discretion. (*See DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010).)

### C. A jury verdict is reviewed for substantial evidence.

Finally, a jury verdict must be reversed where it is not supported by substantial evidence. (*See Tradewind Transp. Co. v. Taylor*, 267 F.2d 185, 190 (9th Cir. 1959) ["To sustain a jury verdict in the federal courts there must be substantial evidence."].)

## VII. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS THERE IS A GENUINE DISPUTE OF MATERIAL FACT REGARDING WHETHER THE CHALLENGED STATEMENT IS FALSE AND MATERIAL.

In granting Appellees' Motion for Partial Summary Judgment, the district court found the "Manufactured in the USA 100%" portion of the Challenged Statement literally false and "material as a matter of law." (1-ER-22; 1-ER-26.) In reaching these conclusions, the district court relied on law regulating claims Appellees were no longer pursuing, ignored the plain language of the statute which dictates only one outcome, and held Bigelow to a higher standard than required on summary judgment. Ultimately, because there is a genuine issue of material fact and the district court incorrectly applied the relevant law, summary judgment must be reversed.

### A. Appellees are not entitled to judgment as a matter of law as to literal falsity as there is a substantive difference between "made" and "manufactured".

In finding the "Manufactured in the USA 100%" portion of the Challenged Statement literally false, the district court erred in determining there was no substantive difference between "made" and "manufacture", citing Section 17533.7. The issue of falsity under the facts of this case could not be determined as a matter of law as it is a question of fact that should have been decided by the jury.

"The standard for proving literal falsity is rigorous," as "only an unambiguous message can be literally false." (*Honeywell Int'l Inc.*, *supra*, 45 F.Supp.3d at 986, quoting *Buetow*, *supra*, 650 F.3d at 1186 [discussing Lanham Act false advertising claims].) Thus, "[a] literal falsity argument fails when an advertisement can reasonably be understood as conveying different messages." (*Id.*) "When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context." (*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).) "Literal falsity is a question of fact." *(Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. C 12-03762 SI, 2014 WL 572290, at *5 (N.D. Cal. Feb. 11, 2014).)

At the outset, Appellees were no longer bringing a claim under Section 17533.7. (1-ER-19; 3-ER-343.) Instead, the only claims certified were: (1) CLRA; (2) fraud; (3) intentional misrepresentation; and (4) breach of express warranty. (1-ER-14.) Thus, the question of whether "made" and "manufactured" are analogous—ultimately bearing on whether the Challenged Statement is literally false as a matter of law—must be examined in the context of those claims. (*See*, *e.g.*, *Larson v. UHS of Rancho Springs, Inc.*, 230 Cal.App.4th 336, 350 (2014), *as modified* (Oct. 2, 2014) [declining to consider the definition of professional negligence in a similar but distinct statutory provision because "section 425.13 does not include MICRA's definition of professional negligence and it is not part of MICRA"].) Section 17533.7 has its own set of guidelines as to whether the use of "Made in the USA" in a given case is legal or not. By the district court's own admission, "manufactured" is not the same as "made" and Appellees were not bringing allegations that Bigelow said the product was "Made in the USA". (1-ER-19.)

However, even if the Court were to look to Section 17533.7 for guidance, finding no substantive difference between "made" and

"manufactured" cannot be reconciled with the plain language of the statute. Statutory interpretation requires courts to start by examining the plain meaning of a statute, for "as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language. . . ." (*U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240-41 (1989).) It is the job of courts to "presume that a legislature says in a statute what it means and means in a statute what it says there." (*Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992).) Plainly, the court "'has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.'" (*Stephens v. County of Tulare*, 38 Cal.4th 793, 801-02 (2006), citing *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal.4th 53, 59 (2002).) "In reviewing the statutory language, [the Court must] reject an interpretation that would render particular terms mere surplusage, and instead seek to give significance to every word." (*Colgan v. Leatherman Tool Grp., Inc.* ["*Colgan*"], 135 Cal.App.4th 663, 683 (2006), *as modified on denial of reh'g* (Jan. 31, 2006).)

Under Section 17533.7, it is prohibited for "any person, firm, corporation, or association to sell or offer for sale in this state any

merchandise on which merchandise or on its container there appears the words 'Made in U.S.A.,' 'Made in America,' 'U.S.A.,' or similar words if the merchandise or any article, unit, or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States." (Cal. Bus. & Prof. Code, § 17533.7, subd. (a).) The intentional inclusion of "made, manufactured, or produced outside of the United States" makes clear that "made" and "manufactured" are not meant to be analogous or interchangeable. (*Id.* [emphasis added].) Instead, the use of both terms with the disjunctive "or" confirm their uniqueness. (*See Colgan*, *supra*, 135 Cal.App.4th at 685 ["Moreover, the phrase 'made, manufactured, or produced' is in the disjunctive. If any one of those processes substantially takes place outside the United States, the use of the 'Made in U.S.A.' designation would be unlawful."].)

The district court's reading of Section 17533.7 runs afoul of the plain language, instead creating a disfavored surplusage. (*See Fischer v. United States*, 603 U.S. 480, 496 (2024), quoting *United States v. Fischer*, 64 F.4th 329, 374 (D.C. Cir.) ["But 'surplusage is nonetheless disfavored,' and [the Court's] 'construction that creates substantially less of it is better than a construction that creates substantially more.'"].) To

interpret Section 17533.7 as equating "made" with "manufactured" would create surplusage at multiple points of the statute. If, as the district court concluded, the words "made" and "manufactured" were not substantively distinct, it would have been unnecessary for the Legislature to include both. Instead, the plain language of Section 17533.7 supports Bigelow's interpretation that "made" and "manufactured" connote distinct processes and cannot be used interchangeably.

This is bolstered by the district court's own order. The district court explicitly gave distinct definitions for "made" and "manufactured". Specifically, the district court defined "made" as "artificially produced by a manufacturing process" and "manufactured" as "something made from raw materials by hand or machinery' and 'describe[s] the physical process of transforming raw materials into goods.'" (1-ER-19.) If the terms were so interchangeable, there would be no need to separately define the terms. In fact, if they were analogous, the terms would have had identical definitions, creating surplusage. Instead, the definitions given describe two distinct concepts that should be separately considered.

With this determination, the rule outlined by the district court cannot be reconciled. In its analysis, the district court found that the tea

leaves, "which are a key component of the tea bags Products, undergo a 'physical process' that 'transforms' them from 'raw' unconsumable tea leaves into a consumable 'good' of a distinct variety and flavor profile…outside of the United States." (1-ER-21.) Thus, the district court reasoned, "[t]hat [Bigelow] takes further action to create the end products, the tea bags, does not negate the fact that the tea leaves have already been processed abroad and are no longer a raw material prior to import." (*Id.*) However, this rule would inadvertently analogize the two processes (i.e., harvesting/processing vs. blending/packaging), penalizing a manufacturer under a "made" standard. Further, neither the district court nor the parties engaged in a discussion of what constitutes a "raw material" thereby leaving further questions regarding the applicability of the district court's proposed rule.

Under the district court's rationale, any product similarly made, could not be labeled "Manufactured in the USA" if the raw materials underwent basic processing before being imported, still as raw materials, by the retailer. Instead, to enjoy the use of "Manufactured in the USA", the retailer would have to import the raw materials in their original form. This strict standard cannot be what is intended when seeking to regulate

the use of "Manufactured in the USA" on products as it would render the difference between the terms made and manufactured surplusage. It was error to determine falsity in the context of this case as a matter of law.

### B. There is a genuine dispute of material fact as to whether the "Manufactured in the USA 100%" portion of the Challenged Statement is false because a reasonable consumer could easily interpret that statement to mean the tea bags are manufactured in the United States.

"Under California law, the plaintiff has the burden of proving by a preponderance of the evidence that a challenged advertisement is false or misleading under the UCL and CLRA." (*Sonner*, *supra*, 911 F.3d at 992–93.) To prevail on their claims, Appellees must show "that a 'reasonable consumer' is likely to be misled by the representation." (*Moore v. Trader Joe's Co.*, 4 F.4th 874, 881 (9th Cir. 2021).) Specifically, "[t]o meet this standard, [Appellees] must demonstrate 'more than a mere possibility that [the seller's] label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner ... [r]ather, the reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" (*Id.*, quoting *Ebner v. Fresh Inc.*, 838 F.3d 958, 965 (9th Cir. 2016).)

Importantly, "a plaintiff's unreasonable assumptions about a product's label will not suffice." (*Id.*)

The portion of the Challenged Statement at issue represented that Bigelow tea bags are "Manufactured in the USA 100%". "Manufacture" means "something made from raw materials by hand or by machinery". (*Manufacture,* MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/manufactured [last visited February 17, 2025].) As explained above, Bigelow sources some of its raw materials—namely, the tea leaves—from China, India, and Sri Lanka. (10-ER-1682.) However, once Bigelow receives the raw tea leaves, they are not sold as is, but instead transformed into a new product. (*Id.*) First, Bigelow takes the raw tea and creates its proprietary blends at its manufacturing facilities. Blending is done in 1,000-pound batches according to formulations, which are followed strictly to give the tea bag the right "end-flavor profile". (5-ER-708.) Once blended, Bigelow transports the bags to one of its manufacturing facilities to continue the process. (*Id.*)

[redacted]

[redacted] The final product is then placed into boxes and shipped to retailers. (*Id.*) Without the sourcing, importing, blending, sampling, assembling, and packaging, there would have been no final packaged tea bag product for Appellees to purchase.

It is more than reasonable that a consumer would understand the phrase "Manufactured in the USA" to mean the tea bags are manufactured in the United States using raw materials. The very definition of manufacture describes to the letter the process Bigelow employs. The tea bags are "something made from raw materials by hand or by machinery." (*Manufacture,* MERRIAM WEBSTER, *supra.*) Appellees presented no evidence to suggest a reasonable consumer would read the term "Manufactured in the USA" in connection with tea bags and assume the constituent tea leaves were grown or harvested in the United States. If Bigelow had placed the Challenged Statement on a box of loose-leaf tea—something they rarely even sell—it's plausible that a reasonable consumer would assume the tea leaves were from the United States. However, the product Appellees bought and are challenging is **packaged tea bags**.

Moreover, Bigelow openly provides information about where its raw tea leaves and botanicals are sourced. In fact, a reasonable consumer who wanted to confirm where the raw materials were sourced need only look at the box. The Earl Grey Tea displays that the bergamot oil was sourced "from Calabria, Italy" on the front of the box, while the English Teatime carton includes a picture of Cindi Bigelow on the top touring the tea fields in India. (6-ER-892; 6-ER-1043; 6-ER-1045; 8-ER-1582; 8-ER-1583.) Further, as Appellees point out in the FAC, Bigelow's website openly advertises the raw tea leaves are sourced from Sri Lanka or India. (ECF 11; *see also* 6-ER-1032-1033 ["Q: And when Bigelow decided to put this statement on the box, did Bigelow intend to deceive its customers or consumers that other ingredients or components were sourced? A: No, sir. That's why we use the top of the box to talk about our sourcing."].) In fact, the FAC references videos on Bigelow's website which discuss how the raw tea leaves are obtained in Sri Lanka. (ECF 11.)

Because there is a substantive difference between "made" and "manufactured and a reasonable consumer could interpret the "Manufactured in the USA 100%" portion of the Challenged Statement as conveying different messages, there is a genuine dispute of material

fact, making summary judgment improper. Whether Bigelow "manufactured" the tea bags 100% in the USA was a question of fact for the jury.

### C. The district court erred in finding Appellees have shown reliance as they did not establish exposure or materiality.

At summary judgment, the district court found that "[r]eliance is established through a showing of exposure and materiality", citing Judicial Council of California Civil Jury Instruction 4700 ("CACI 4700"). (1-ER-22.) The district court further found that "if all class members have been exposed to the same material misrepresentations, class-wide reliance will be inferred, unless rebutted by the defendant", again citing CACI 4700. (*Id.*) However, the district court provided no other authority for these statements of law. "[J]ury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent." (*People v. Morales*, 25 Cal.4th 34, 48 (2001); *see also McDowell v. Calderon*, 130 F.3d 833, 840 (9th Cir. 1997) ["The texts of 'standard' jury instructions are not debated and hammered out by legislators, but by ad hoc committees of lawyers and judges. … Their

precise wording, although extremely useful, is not blessed with any special precedential or binding authority."].)

For claims under the UCL, CLRA, and others, a plaintiff must show actual reliance on the misrepresentations. (*See Zeiger v. WellPet LLC*, 526 F.Supp.3d 652, 684 (N.D. Cal. 2021).) "A plaintiff can do so by showing that the misrepresentation or omission 'played a substantial part...in influencing his decision,' or by showing that the misrepresentation or omission was material." (*Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247, 270 (S.D. Cal. 2023), *on reconsideration in part,* No. 19CV1715-JO-AHG, 2023 WL 9692466 (S.D. Cal. June 6, 2023), quoting *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal.App.4th 835, 864 (2007).)

While "a plaintiff need not show that '[the challenged] misrepresentations were the sole or even the decisive cause of the injury-producing conduct'", "a plaintiff must demonstrate that the misrepresentation or omission was an 'immediate cause of the injury-causing conduct[.]'" (*Id.*, quoting *Kwikset Corp. v. Superior Court* ["*Kwikset*"], 51 Cal.4th 310, 327 (2011) and *In re Tobacco II Cases*, 46 Cal.4th 298, 328 (2009).) Importantly, "[w]hether a party relied on a

misrepresentation or whether that reliance was justified are almost always questions of fact that are not suitable for resolution as a matter of law on summary judgment." (*Hall*, *supra*, 344 F.R.D. at 270.)

#### i. The district court erred in presuming class-wide exposure without conducting an analysis under the standard for summary judgment.

In its order, the district court asserted that "a showing of class-wide exposure sufficient to establish predominance at the class certification stage creates a rebuttable presumption that there was in fact class-wide exposure". (1-ER-23.) However, the district court cited no authority to support this assertion and Bigelow can find none. Instead, as the district court acknowledged, "'[t]he standards and burdens at class certification differ from those at summary judgment.'" (1-ER-23; *see also Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018), quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ["a class certification decision 'is far from a conclusive judgment on the merits of the case'".].) The district court did not conduct an analysis of exposure under any summary judgment standard, instead it stated "[c]onsistent with the class certification order, the Court finds that the challenged statement is more prominent that [sic] those in [Bigelow's]

cited cases…and [Bigelow] has not pointed to any evidence to rebut the presumption.” (1-ER-23.) This failure to address exposure at summary judgment constitutes error by the district court.

However, even if the district court was correct, Bigelow established the Challenged Statement was not prominently displayed sufficient to rebut any presumption of exposure. The Challenged Statement appears on the back of the box in the lower corner. (*See* 10-ER-1685; *see also* 8-ER-1582-1583.) Appellees presented no testimony, evidence, or analysis to suggest any consumer would pick up the product and examine the back panel prior to purchase sufficient to establish exposure.

Instead, the case law supports a finding that exposure is not satisfied. For example, in *Hadley v. Kellogg Sales Co.*, the district court declined to certify a class with respect to a challenged statement that appeared only on the back of the box. (*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1099 (N.D. Cal. 2018) [“class-wide exposure to the ‘wholesome goodness’ phrase on Nutri-Grain packaging cannot be inferred… [because it] only appeared (1) on the back panel of the Nutri-Grain packaging; (2) ‘in small font’; and (3) in the middle of a block of text”.].) Similarly, in *Zakaria v. Gerber*, the district court rejected the

inference that any "consumer would have been the misleading statement" that was "on the back…cover." (*See Zakaria v. Gerber*, 2016 WL 6662723, at *8 (N.D. Cal. Mar. 23, 2016).) Thus, Bigelow has presented sufficient argument to overcome a presumption of exposure and create a genuine dispute of material fact as to whether exposure is satisfied.

#### ii. The district court erred in finding materiality was established as a matter of law as there is no brightline rule entitling Appellees to a presumption of materiality and there is a genuine issue of material fact.

"A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" (*Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 977 (1997) quoting Rest.2d Torts, § 538, subd. (2)(a).) "[M]ateriality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.'" (*Id.* quoting Rest.2d Torts, § 538, com. e.) The district court found Appellees were entitled to judgment as a matter of law; however, this finding is improper. Instead, at most, Appellees were

entitled to a rebuttable presumption as to materiality, which Bigelow overcame with the evidence presented at summary judgment. Because Appellees are not entitled to judgment as a matter of law and there is a genuine issue of material fact regarding the materiality of the Challenged Statement, summary judgment must be reversed.

#### a. Appellees are not entitled to judgment as a matter of law as the case law, at most, suggests a rebuttable presumption, not an automatic determination.

At summary judgment, the district court found Appellees were entitled to judgment as a matter of law as to materiality because "when the legislature has seen fit to specifically outlaw certain statements in order to protect consumers, such statements are material as a matter of law." (1-ER-25.) The district court cited to *Kwikset Corp. v. Superior Ct.*, *supra*, and *Hinojos v. Kohl's Corp.* ("*Hinojos*"), 718 F.3d 1098 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) to support this proposition. However, neither of these cases establish a brightline rule that a party is automatically entitled to a finding of materiality as a matter of law. Instead, these cases examined whether a Plaintiff had standing to sue under the applicable statutes and suggest,

in arguable dicta, a rebuttable presumption of materiality that can be overcome with sufficient evidence presented by the non-moving party.

In *Hinojos*, this Court examined whether a plaintiff "allege[d] that he 'lost money or property' and, therefore, has statutory standing under California law to sue [defendant] to enforce California's prohibition on [the alleged] deceptive marketing practice." (*Hinojos*, *supra*, 718 F.3d at 1101.) In rejecting the district court's "benefit of the bargain" rationale, this Court noted that "[a] representation is 'material,' however, if a reasonable consumer would attach importance to it *or* if 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." (*Id*. at 1107, quoting *Kwikset*, *supra*, 51 Cal.4th at 892 [emphasis in original].) This Court then suggested—again, in dicta—that "the legislature's decision to prohibit a particular misleading advertising practice is *evidence* that the legislature has deemed that the practice constitutes a 'material' misrepresentation, and courts must defer to that determination." (*Hinojos* at 1107 [emphasis added].) This Court did not expand upon this statement or engage in a discussion as to materiality in the context of summary judgment.

In *Kwikset*, the California Supreme Court also examined "the standing requirements of the unfair competition and false advertising laws in the wake of Proposition 64." (*Kwikset*, *supra*, 51 Cal.4th at 317.) When discussing materiality, the court restated the rule that "[a] misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" (*Id*. at 332, citing *Engalla*, *supra*, 15 Cal.4th at 977.) The court conceded that "the Legislature has by statute made clear that whether a product is manufactured in the United States or elsewhere is precisely the sort of consideration reasonable people *can and do* attach importance to in their purchasing decisions. . . ." (*Kwikset* at 332 [emphasis added].) However, the court ultimately noted that "materiality is generally a question of fact." (*Id*.)

Both *Hinojos* and *Kwikset* frame materiality as a question of fact and that the plaintiff may enjoy a rebuttable presumption if the Legislature has seen fit to outlaw the alleged misrepresentation. However, the courts go no further. Neither case states materiality is to be automatically satisfied based on Legislative intent as the district court

suggests. Instead, these cases suggest a rebuttable presumption of materiality based on the Legislature's decision to outlaw certain practices. Therefore, the district court's automatic finding of materiality as a matter of law goes against the underlying rule reiterated by both *Hinojos* and *Kwikset* which requires an examination of whether "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." (*Kwikset*, *supra*, 51 Cal.4th at 317.)

**b. The district court improperly held Bigelow to a higher evidentiary burden even though sufficient evidence was submitted to rebut the presumption of materiality and raise a genuine issue of material fact.**

At summary judgment, Bigelow presented substantial evidence which created a genuine issue of material fact as to materiality. First, Bigelow presented pre-litigation market data which supported that the source of the tea leaves was not material. (10-ER-1689-1690.) [redacted] Second, Bigelow

presented the expert declaration of Dr. Larry Chiagouris, who conducted a survey and confirmed the Challenged Statement had no material impact on purchasing behavior. (3-ER-196.) The survey asked one group to view the tea in their original form and a second group to view the packaging with the references to "America" or "USA" removed. (3-ER-201.) Dr. Chiagouris concluded the "America" related statements had zero impact on consumer's purchasing interest. (3-ER-217.) In response, Appellees' expert, Dr. Dennis, offered neither a competing survey nor contradictory opinion on the issue of materiality. (10-ER-1690.)

In granting summary judgment in favor of Appellees, the district court rejected Bigelow's rebuttal evidence as "self-serving surveys and market research", saying the evidence was "insufficient to rebut the presumption." (1-ER-26.) However, in reaching this conclusion, the district court held Bigelow to a standard beyond that required at summary judgment—something this Court explicitly rejected in *Sonner*.

In *Sonner*, this Court reversed a grant of summary judgment after holding the district court "elevated Sonner's burden well beyond what is usually required to defeat summary judgment." (*Sonner*, *supra*, 911 F.3d at 992.) Specifically, this Court held that "Sonner easily met her burden

by producing expert testimony and other scientific data" and the district court elevated her burden "[b]y requiring Sonner to do more—by not only producing affirmative expert evidence of her own but also 'foreclos[ing] any possibility' that Schwabe's products provided the labeled benefits." (*Id.*) This Court explained that "[a]t trial, undoubtedly each party will seek to undermine the scientific bases underlying the opinion of the opposing party's expert" but "[t]hose arguments… go to the weight that the fact-finder should give to the evidence, an inquiry that is not proper at the summary judgment stage." (*Id.* at 992-93.) This Court held "[i]f the plaintiff's evidence suggests that the products do not work as advertised and the defendant's evidence suggests the opposite, there is a genuine dispute of material fact for the fact-finder to decide." (*Id.* at 993.)

If Bigelow, as the non-moving party, can show "evidence of a genuine dispute of material fact that could satisfy its burden at trial", then Appellees are not entitled to summary judgment. (*Sonner*, *supra*, 911 F.3d at 992.) Bigelow did just that. Bigelow presented evidence from both an expert and pre-litigation market surveys which directly contradicted Appellees' assertion that the Challenged Statement was material to consumers. This created a factual dispute precluding

summary judgment for Appellees. (*See, e.g., In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1425 (9th Cir.1994) ["As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case."].)

Because Appellees are not entitled to judgment as a matter of law as to falsity and reliance, and there is a genuine dispute of material fact as to falsity and materiality, summary judgment was improperly granted. Thus, the judgment must be reversed.

## VIII. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING THE IRI SPREADSHEETS.

Appellees alleged the Challenged Statement allowed Bigelow to incur higher profit—via an alleged price premium—and Bigelow should therefore compensate the effected class for this improper profit. Appellees sought to prove this by employing Weir to conduct a study into whether there was a price premium. Weir concluded there was. However, Weir based his findings on inadmissible spreadsheets purchased from IRI by Appellees' counsel for this litigation.

As discussed below, these IRI spreadsheets are unauthenticated, and speculative, and based on multiple levels of hearsay. Appellees and Weir argued in the district court that IRI spreadsheets are widely used

by companies, government agencies, universities, researchers, and others. (2-ER-53; 2-ER-55; 7-ER-1157.) However, the context in which these other parties use the IRI spreadsheets is far different from the context in which Appellees' expert used the IRI spreadsheets. IRI spreadsheets are traditionally used to assist in making marketing decisions, to gain insight into the popularity of a product, or hypothesize within a specified research project. Weir is using these unauthenticated, speculative, hearsay-based projections to draw specific conclusions regarding damages Appellees allegedly sustained to the tune of millions of dollars.

Appellees have a duty to prove their damages by a preponderance of the evidence. In lockstep, the courts have a responsibility to ensure the damages Appellees seek against Bigelow are grounded in accurate and admissible data. Appellees' decision to use the IRI spreadsheets was a strategic choice, one that almost doomed their case. (*See*, *supra*, VIII.A.) As the district court expressly stated during the first pretrial conference, "it's not complicated… You either get the data from the horse's mouth, or you subpoena retailers and you get a representative sample… But you don't have a… lawyer go pay for an economic study from a company, and

then come in and say, now we want that admitted into evidence…." (2-ER-145-146.) Appellees could have easily subpoenaed the records directly from the retailers and avoided this situation entirely. In fact, in a related case in the Eastern District of New York, Appellees did just that—choosing to subpoena the retailers directly for the data needed to support their damages model. (*See* ECF 198-1 at 9, fn. 6.) But, they chose not to in this matter and must stand by their strategic decision.

The district court abused its discretion in admitting the IRI spreadsheets, which in turn prejudiced Bigelow, who is now liable for a verdict of over $2 million dollars based on inadmissible evidence. As such, the jury verdict must be reversed.

### A. The district court erred in admitting the unauthenticated IRI spreadsheets.

Appellees failed to properly authenticate the IRI spreadsheets used by Weir in his damages model as required by the Federal Rule of Evidence 901. Appellees were granted extraordinary relief from the district court and allowed to depose Porod, Circana Executive Vice President, after narrowly having the spreadsheets excluded on the eve of trial. Porod, however, [redacted] Ultimately,

Porod's deposition testimony did not answer the lingering questions presented by the district court and Bigelow. Thus, the district court abused its discretion in admitting the evidence.

Porod was designated as the person most knowledgeable ("PMK") by IRI to authenticate the spreadsheets and lay the foundation for their admissibility. Thus, it is assumed Porod is "the 'most qualified person…to testify on [IRI's] behalf." (*Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 798, fn. 4 (9th Cir. 2003), quoting Schwarzer, Tashima & Wagstaffe, Cal. Prac. Guide: Fed. Civ. Pro. Before Trial ¶ 11:1409 at 11–142 (The Rutter Group 2003).) [redacted] While Porod's [redacted] is not surprising—as Porod [redacted]—as the PMK he should be informed enough to answer the necessary questions. (11-ER-1936.) As explained below, [redacted]

[redacted]

First, [redacted]

Second, [redacted]

[redacted] Further, [redacted]

Third, [redacted]

Fourth, [redacted]

[redacted] Thus, the district court abused its discretion in admitting the IRI spreadsheets.

### B. The district court erred in admitting the IRI spreadsheets as they were inadmissible hearsay.

The IRI spreadsheets are also inadmissible hearsay under Federal Rules of Evidence 801 and 802. The IRI spreadsheets contain at least four levels of inadmissible hearsay being used to prove the truth of total sales:

[redacted] Each step in this hearsay chain is an out-of-court statement being used to prove the truth of total sales. Thus, under Rule

802, the spreadsheets are inadmissible. Further, Appellees cannot show the spreadsheets are subject to a hearsay exception as they do not meet the required elements to be either business or market records.

#### i. The IRI spreadsheets are not admissible under the Rule 803(6) business records exception because they were purchased for litigation.

The IRI spreadsheets do not meet the necessary elements of the Federal Rule of Evidence 803(6), which allows for the admission of hearsay as a business record of a regularly conducted activity if: (1) "the record was made at or near the time by--or from information transmitted by--someone with knowledge"; (2) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit"; (3) making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of the custodian or another qualified witness"; and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness…." (Fed. R. Evid. 803, subd. (6)(A)-(E).) The IRI spreadsheets do not qualify for this exception to the hearsay rule.

*MSP Recovery Claims Series LLC v. Farmers Ins. Exch.* ("*MSP*

*Recovery*"), No. 22-55610, 2023 WL 6633838 (9th Cir. Oct. 12, 2023) is instructive.[3] In *MSP Recovery*, plaintiff sought benefits, as an assignee of members, from various Medicare Advantage Organizations ("MAO"). (*MSP Recovery* at *1.) Plaintiff "relied on a set of spreadsheets to substantiate its claims" but "[t]he district court excluded the spreadsheets as inadmissible hearsay". (*Id.*) The district court further rejected plaintiff's argument that the spreadsheets were "subject to the exception for business records." (*Id.*)

On appeal, plaintiff argued "each spreadsheet contain[ed] 'raw data' that the MAOs directly transferred to MSP" and it had "sufficiently established 'the admissibility of the records Plaintiffs receive[d] from the [MAOs] and others.'" (*Id.*) However, this Court rejected those arguments, instead finding "the spreadsheets do not consist of that raw data alone" but actually "combine 'Raw Assignor data, Third-Party Data, and defendant discovery'" and that the records plaintiff received from the MAOs "were never presented to the court." (*Id.*) This Court also found "the spreadsheets were created 'during this litigation for purposes of this

[3] "Unpublished dispositions and orders…issued on or after January 1, 2007[,] may be cited to the courts of this circuit in accordance with FRAP 32.1". (Ninth Circuit Rule 36-3, subd. (b).)

litigation' from third-party data, MAO data, and defendant discovery", therefore they were not "records 'kept in the course of a regularly conducted activity of a business.'" (*MSP Recovery* at *1.)

The IRI spreadsheets suffer from the same flaws. To create the spreadsheets, [redacted] The spreadsheets also contain [redacted] Further, the spreadsheets were based on [redacted] Thus like the spreadsheets in *MSP Recovery*, the IRI spreadsheets are not "records 'kept in the course of a regularly conducted activity of a business. . .'" and not be admissible under the business records exception. (*MSP Recovery* at *1.)

**ii. The spreadsheets are not admissible under the Rule 803(17) market records exception because the sales projections resulting from IRI's proprietary algorithm are not "objective facts".**

The IRI spreadsheets obtained by Appellees are not market records.

Federal Rule of Evidence 803(17) allows for the admission of hearsay as a market report if the evidence is "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." (Fed. R. Evid. 803, subd. (17).) "'The type of publications contemplated by Rule 803(17) are those which deal with compilations of objective facts not requiring for their statement, a subjective analysis of other facts.'" (*JIPC Mgmt., Inc. v. Incredible Pizza Co.*, No. CV 08-04310 MMM PLAX, 2009 WL 8591607, at *24 (C.D. Cal. July 14, 2009), quoting *In re Dual–Deck Video Cassette Recorder Antitrust Litigation*, No. CIV 87–987 PHX RCB, 1990 WL 126500, *4 (D.Ariz. July 25, 1990).) These types of publications include "newspaper market reports, telephone directories, and city directories." (Fed. R. Evid. 803(17), Advisory Committee Notes, 1972 Revision, Note to Paragraph 17.) The IRI spreadsheets provided by Appellees do not fall within this exception.

When compared to the examples provided in the Rule's advisory comments, the distinction is clear. Take, for example, a telephone directory. The compilation of telephone numbers does not require a subjective analysis of other facts to compile—the telephone number

either exists or it does not. In contrast, the IRI spreadsheets "do not appear to be objective compilations of easily ascertainable facts of the sort contemplated by the [r]ule; rather, contain conclusions reached after analysis by a specialized marketing research company." (*JIPC Mgmt., Inc.*, *supra*, at *24 [finding reports created by media research company which document exposure achieved by sponsors during broadcasts of NASCAR events likely are not an exception to hearsay under 803(17).].)

[redacted] As such, the spreadsheets would not be admissible as market reports under Rule 803(17).

**C. The district court's admission of the IRI spreadsheets prejudiced Bigelow in a manner warranting reversal.**

Under Federal Rule of Evidence 103, "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party." (Fed. R. Evid. 103, subd., (a); *see also Obrey v. Johnson* ["*Obrey*"], 400 F.3d 691, 699 (9th Cir. 2005).) Put differently, "[the Court]

require[s] a finding of prejudice." (*Obrey* at 699.) "[W]hen reviewing the effect of erroneous evidentiary rulings, [the Court] will begin with a presumption of prejudice." (*Id.* at 701.) Thus, the burden lies with Appellees to show "it is more probable than not that the jury would have reached the same verdict even if the evidence had [not] been admitted." (*Id.*; *see also Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983).) Appellees cannot overcome this presumption.

The jury's verdict was tainted by the admission of the IRI spreadsheets, as this was the sole basis for Weir's damages model. The trial on damages was a "battle of the experts." Days 4 and 5 of trial saw the testimony of 3 experts regarding the IRI spreadsheets and Weir's damages model. The IRI spreadsheets are a critical component to Weir's damages model. Without the spreadsheets, Weir would not have the foundation to calculate a damages figure, as Appellees did not subpoena the retailers for the records directly. Frankly, "[t]he evidence at issue was not merely tangential or cumulative; rather, it was directly probative of the central issues in dispute." (*Obrey*, *supra*, 400 F.3d at 701–02 [holding exclusion of testimony and statistical evidence resulted in prejudice warranting reversal].)

Bigelow was prejudiced by the admission of the IRI spreadsheets because without it, Appellees had no basis to establish damages, and therefore no basis for more than $ 2 million in damages awarded by the jury. As such, reversal is required.

## IX. THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING THE EXPERT TESTIMONY OF COLIN WEIR.

In order to prove the alleged price premium, Appellees employed Weir to provide expert testimony. Weir determined there was a price premium of 11.07%. (7-ER-1131.) Weir then took the IRI spreadsheet projections and applied the 11.07% price premium to calculate the proposed damages. Bigelow objected to the admission of Weir's testimony at multiple stages of the litigation, as his testimony was not based on sufficient facts or data as required under Rule 702, but instead on the inadmissible IRI spreadsheets. Further, Weir's testimony could not be saved under Rule 703 as the probative value of the IRI spreadsheets in no way substantially outweighs its prejudicial effect.

District courts have "an unwavering gatekeeping obligation to determine the reliability" of expert testimony to prevent unfounded or unreliable opinions from spoiling a jury trial. (*U.S. v. Valencia-Lopez*, 971 F.3d 891, 899 (9th Cir. 2020).) Under Rule 702, "[a] witness who is

qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that… the testimony is based on sufficient facts or data…" (Fed. R. Evid. 702, subd., (a)-(d); *see also Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993).) The burden was with Appellees to show their expert testimony was admissible by a preponderance of the evidence. (*Engilis v. Monsanto Co*., 151 F.4th 1040, 1050 (9th Cir. 2025).) Appellees failed to do so, therefore the district court abused its discretion in admitting Weir's testimony.

### A. Appellees failed to carry their burden under Rule 702(b) to show Weir's testimony is based on sufficient facts or data.

Rule 702(b) requires expert testimony be "based on sufficient facts or data." (Fed. R. Evid. 702, subd., (b).) "[T]he key inquiry … is 'whether an expert had sufficient factual grounds on which to draw conclusions.'" (*Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024), quoting *Elosu v. Middlefork Ranch Inc*., 26 F.4th 1017, 1025-1026 (9th Cir. 2022).) Because the IRI spreadsheets are inadmissible hearsay,

there is no other evidence in the record from which Weir could draw the conclusions contained within his expert report.

However, even if the Court was to decide the IRI spreadsheets are not inadmissible hearsay, Weir's expert testimony still fails to satisfy the burden established under Rule 702. Weir—nor any other party or the district court—has seen the raw data from IRI regarding Bigelow's actual retail sales. [redacted] It is therefore unclear how Weir, Porod, or Appellees could satisfy by a preponderance of the evidence: (1) the accuracy of the data and facts underlying Weir's expert report; (2) the process by which the data is gathered; and (3) confirm whether the data includes only the sales relevant to the class. Thus, it cannot be said Weir had sufficient factual grounds on which to draw conclusions and the testimony must be excluded.

**B. Weir's testimony would not be admissible under Rule 703 as the IRI spreadsheets' probative value does not outweigh its prejudicial effect.**

Rule 703 states an expert may "base an opinion on facts or data in the case that the expert has been made aware of or personally observed."

(Fed. R. Evid. 703.) The rule further states that "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." (*Id.*) However, "if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." (*Id.*) Thus, when evaluating whether an expert can rely on the reports of others, two questions must be answered: (1) "'whether the facts are of a type reasonably relied on by experts in the particular field'"; and (2) "whether the probative value of the underlying data substantially outweighs its prejudicial effect." (*Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1061 (9th Cir. 2003), quoting *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir.1980) and citing Fed. R. Evid. 703.) Neither criteria is met.

First, Appellees, Weir, and Porod all failed to establish the IRI spreadsheets are used by experts to calculate *Daubert*-compliant damages models. As discussed, *supra*, Appellees and Weir argued in the district court that IRI spreadsheets are widely used by companies,

government agencies, universities, researchers, and others—all outside of litigation. (2-ER-53; 2-ER-55.) Indeed, the contexts in which these other parties use the IRI spreadsheets do not compare to the context in which Appellees used the IRI spreadsheets. Using the IRI spreadsheets to inform marketing decisions or gain insight into the popularity of a product in no way carries the same consequences as allowing an expert to use them as the foundation for a damages model.

Second, given the unauthenticated and speculative nature of the IRI spreadsheets, the probative value of the projections does not substantially outweigh their prejudicial effect. The multitude of lingering questions regarding how the projections relate to the raw data, what percentage of the projections are based on census data versus non-census data, the question of the projections' author, and the inability of Appellees or Weir to confirm the projections are accurate and what Appellees requested makes them severely prejudicial to Bigelow. Appellees could have easily obtained the raw data directly from the retailers, ensuring their accuracy, but chose not to. They should not be allowed to use Rule 703 to save their case based on a strategic litigation

decision. The district court abused its discretion in admitting Weir's expert testimony.

### C. The admission of Weir's expert testimony prejudiced Bigelow in a manner that warrants reversal.

The admission of Weir's testimony was an abuse of discretion and Appellees cannot overcome the presumption of prejudice. As previously stated, a party must show prejudice to warrant reversal of an evidentiary ruling. (Fed. R. Evid. 103, subd., (a); *see also Obrey, supra*, 400 F.3d at 699.) The Court begins with a presumption of prejudice and the burden is on Appellees to show "it is more probable than not that the jury would have reached the same verdict even if the evidence had [not] been admitted." (*Obrey* at 699.) Like with the IRI spreadsheets, it is plain from the record that the jury would not have reached the same verdict if Weir's testimony had been excluded. Weir was Appellees' sole expert to give an opinion on damages, thus without him, Appellees would not be able to show they sustained any damages for which Bigelow could be held liable. (*See*, *e.g.*, *Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 950 (S.D. Cal. 2019) ["The Court finds that there is an absence of evidence to support Plaintiff's claim for actual damages under the CLRA and

therefore GRANTS Defendants' motion for summary judgment as to actual damages."].)

## X. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING BIGELOW'S MOTION FOR NEW TRIAL AND THE JURY VERDICT SHOULD BE REVERSED BECAUSE IT IS NOT SUPPORTED ANY EVIDENCE.

Following the jury verdict in favor of Appellees and an award of over $2 million, Bigelow filed a motion for new trial on the grounds that the damages award was based on jury speculation and guesswork. (2-ER-31.) Specifically, Bigelow argued the price premium theory presented by Appellees was one the jury had to accept in an "all or nothing" fashion and instead the jury had modified the percentage without evidentiary basis to award a lower damages amount. (2-ER-37.) The district court rejected this argument, finding the award was based on the jury's weighing of the parties' experts and not speculative. (1-ER-6-7.) However, Appellees' damages model and price premium were based on Weir's conjoint survey, which the jury cannot rerun to account for testimony from Bigelow's experts about the survey's deficiencies. Thus, the jury award of an amount different from Appellees' price premium constitutes speculation and guesswork and should be reversed.

The denial of a motion for new trial is reviewed for abuse of discretion. (*DSPT Int'l, supra*, 624 F.3d at 1218.) Specifically, "[t]he district court's denial of a motion for a new trial is reversible 'only if the record contains no evidence in support of the verdict' or if the district court 'made a mistake of law.'" (*Id.*, quoting *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir.2007).) Where, as here, a damage award is based on "speculation or guesswork" it cannot survive a motion for new trial. (*Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1263 (9th Cir.1981), *cert. denied*, 455 U.S. 1018.) Instead, "the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." (*Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).)

In denying Bigelow's motion for new trial, the district court relied heavily on *Raynor Bros. v. Am. Cyanimid Co.* ("*Raynor Bros.*"), 695 F.2d 382 (9th Cir. 1982), stating that like in *Raynor Bros.*, the jury "awarded a reduced amount of damages based on their assessment of the relative credibility of the parties' expert testimony." (1-ER-6.) The district court ultimately found the "8% price premium reflects the jury's reasonable conclusion about the price premium, based on accepting some of Weir's

testimony and some of Butler's testimony about [Appellees'] damages model." (*Id.*) While *Raynor Bros.* is instructive, it does not support the district court's reasoning. Instead, it affirms the conclusion the jury's damage award was not supported by any evidence in the record.

Raynor Brothers, a farming partnership, purchased herbicide from manufacturer American Cyanimid. (*Raynor Bros., supra,* 695 F.2d at 383.) Raynor Brothers applied the herbicide to fields planted with corn and observed damage after using the product. (*Id.*) Raynor Brothers filed a products liability suit against American Cyanimid. (*Id.*) At trial, Raynor Brothers sought $126,000.00 in damages, with the jury eventually awarding $60,000.00. (*Id.* at 384) American Cyanimid appealed, arguing the jury "could have reached only one conclusion…to give the plaintiff what it asked." (*Id.* at 385.) The court rejected American Cyanimid's argument, finding they had "elicited substantial evidence on cross-examination that contradicted [plaintiff's] computation of damages", including admissions from Raynor Brothers that "the yield differential between treated and untreated acres was based on average yields, and that possibly the Prowl fields had never produced as much as the untreated fields…. Raynor's calculation of the value of corn was based

on market price [when the corn was not sold on the market] …[and] there was evidence that irrigation variables and the inexperienced managing partner of Raynor may have aggravated the damages." (*Id.* at 385.) Because of this, the court held "the jury may have reduced the value per bushel and loss in yield in its calculation of the damages." (*Id.*)

The jury in *Raynor Bros.* was presented "substantial evidence" about the variables that could affect Raynor's calculations of its loss, including: (1) differential between treated and untreated acres; (2) possibility that the fields never produced as much as the untreated fields; (3) using market price when the corn was not sold on the market; and (4) irrigation and staffing variables. (*Raynor Bros.*, *supra*, 695 F.2d at 385.) This allowed the jury to potentially modify different variables, such as "reduce[] the value per bushel and loss in yield in its calculation of the damages." (*Id.*)

While the jury in *Raynor Bros.* was presented with disputed values for certain variables in its calculation of damages (i.e., field yields, corn values, irrigation amounts), the jury's ability to adjust the damages presented by Appellees and Weir differs sharply. Appellees posited that the Challenged Statement resulted in an alleged price premium of

11.07% on the tea products at issue. (4-ER-510; 7-ER-1131.) Appellees reached this conclusion based on the testimony and damages model calculated by Weir. Weir explained to the jury that he conducted a survey involving the Challenged Statement, input that data into a "regression model", then ran a market simulation to find the alleged 11.07% price premium. (7-ER-1134-1135.) Weir only testified that the price premium for the jury to consider was 11.07%. (*See* 7-ER-1131; 7-ER-1135; 7-ER-1149; 7-ER-1151; 7-ER-1170; 7-ER-1176; 7-ER-1208.) He presented no other values and no variables from which a jury could modify or recalculate the 11.07%.

In response, Bigelow's experts, Butler and Dr. Strombom, both testified that Weir's study was fatally flawed. (8-ER-1361-1362; 8-ER-1409.) Neither testified to an alternative price premium value or any quantifiable evidence which would enable the jury to modify the price premium to account for the study's flaws. Instead, as Dr. Strombom blatantly said: "the price premium that Mr. Weir estimates is the critical component of his damage analysis. So if that is not reliable, then his damage estimate is not reliable, and plaintiffs have not shown any

damage. Combined with the evidence on real prices that consumers pay, that shows no evidence of price premium.” (8-ER-1438-1439.)

In Weir’s damages model and the opposing evidence presented by Bigelow, no such variables or evidence exist that could be adjusted like in *Raynor Bros*. The damages model and price premium were based on his conjoint survey, which the jury cannot rerun to account for testimony from Bigelow’s experts about its deficiencies. The jury are not statisticians—it is not their job to correct fatal flaws in Appellees’ damages model to allow for relief. Instead, the jury should have accepted Weir’s testimony and adopted the price premium, or, accepted Butler and Dr. Strombom’s testimony and rejected the price premium.

Because the jury award was based on speculation and guesswork, and not evidence within the record, it was an abuse of discretion not to award a new trial.

Additionally, for the same reasons why the motion for new trial should have been granted, this Court may reverse the jury verdict because it is not supported by substantial evidence. (*Tradewind Transp. Co.*, *supra*, 267 F.2d at 190 [“To sustain a jury verdict in the federal courts there must be substantial evidence”].) As explained above, there is no

evidence in the record to support the jury's calculation of an 8.00% price premium as neither Weir, nor Bigelow's experts gave testimony to support such an award and without supporting substantial evidence, the jury verdict must be reversed.

## XI. CONCLUSION

The jury verdict in favor of Appellees should be vacated as the district court erred in: (1) finding the Challenged Statement literally false and material as a matter of law; (2) admitting the IRI spreadsheets procured by Appellees for the litigation; (3) admitting the expert testimony of Weir as to the alleged price premium; and (4) denying Bigelow's motion for new trial on the grounds of excessive damages.

Dated: April 9, 2026

GORDON REES SCULLY MANSUKHANI, LLP

*/s/ Matthew G. Kleiner*
Matthew G. Kleiner
Tara N. Swanson
*Attorneys for Defendant – Appellant, R.C. Bigelow, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that Appellant's Opening Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,775 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32 because this brief has been prepared in a proportionally spaced typeface, 14-point font.

Dated: April 9, 2026

By: *_/s/ Matthew G. Kleiner*
Matthew G. Kleiner

**Case No. 25-5911**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

KIMBERLY BANKS AND CAROL CANTWELL

*Plaintiffs - Appellees,*

v.

R.C. BIGELOW, INC.

*Defendant - Appellant.*

---

On Appeal from Final Judgment of the United States District Court
For the Central District of California
Case No. 2:20-cv-06208-SVW-RAO
The Honorable Dean D. Pregerson (Ret.)
The Honorable Stephen V. Wilson

---

**PROOF OF SERVICE**

---

I hereby certify that on April 9, 2026, a copy of the foregoing **APPELLANT R.C. BIGELOW, INC.'S OPENING BRIEF [REDACTED]** was filed electronically with the Clerk of the Court using the Court's electronic filing system, PACER, which will send an electronic copy of this filing to all counsel of record.

S. Deissig
Shannon D. Deissig